UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
                                                           :
RICK NOVACK,                                               :    **MEMORANDUM**
                                                           :    **DECISION AND ORDER**
                    Plaintiff,                             :
                                                           :    17-cv-6704 (BMC)
         - against -                                       :
                                                           :
COMMISSIONER OF SOCIAL SECURITY,                           :
                                                           :
                    Defendant.                             :
---------------------------------------------------------- X

**COGAN**, District Judge.

    1.    Plaintiff seeks review of the decision of the Commissioner of Social Security, following a hearing before an Administrative Law Judge, that he is not disabled as defined under the Social Security Act and its regulations for the purpose of receiving supplemental security income. The ALJ found that plaintiff suffers from a severe impairment of bipolar disorder, but that notwithstanding that impairment, he has sufficient residual functional capacity to perform work at any level as long as it is in a low stress environment.[1]

    2.    Plaintiff has raised a number of points and sub-points of error. One of these is that in determining that plaintiff's impairment did not meet the criteria for the Listing of Impairments, 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.04 and 12.06 (effective 2015-17), the ALJ discussed subsections A and B of those Listings, but made only a general reference to his not satisfying any of the criteria in subsection C.

---

[1] Although neither the parties nor the ALJ distinguished between Bipolar I and Bipolar II disorder, it seems clear that plaintiff suffers from Bipolar II disorder. See fn. 2 infra.

3. It is common ground between the parties that plaintiff met the criteria for subsection A. And plaintiff does not contend on this motion that the ALJ improperly analyzed plaintiff's failure to meet the requirements of subsection B. Moreover, the Commissioner does not dispute plaintiff's contention in this review proceeding that plaintiff met the threshold requirement for the application of subparagraph C under Listing 12.04, namely, that plaintiff had a "chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to work activities, with symptoms or signs currently attenuated by medication or psychosocial support …". See 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.04 (effective 2015-17). That meant that plaintiff would have been deemed disabled if he proved he had any of (1) repeated extended episodes of decompensation; (2) such marginal adjustment that even a minimal increase in mental or environmental demands would be predicted to cause decompensation; or (3) a history of at least one year showing him unable to function outside a "highly supportive living arrangement" and a continuing need for such an arrangement. See id. Similarly, under 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.06(C) (effective 2015-17), plaintiff would have been deemed disabled if he was completely unable to function independently of the area of his own home.

4. It is not the case that an ALJ has to specifically analyze every possible listing criteria, just as it is not the case that an ALJ has to specifically analyze each claimed impairment when the record contains no suggestion that it rises to the level of a "severe" impairment. A claim, or even a possibility, is not enough to require specific analysis. To hold otherwise would ask ALJs to justify a nullity, i.e., that the absence of any evidence warrants rejection of the Listing or the classification of an impairment as severe. That would be a waste of time and effort.

5.      Nevertheless, that is not the case here. If plaintiff doesn't meet Listings 12.04 and 12.06, he comes awfully close. As noted above, there is no dispute that he satisfies the subsection A criteria, or that he satisfies the threshold criteria for subsection C under Listing 12.04. Even accepting the Commissioner's position that plaintiff does not satisfy the first or second criteria of subsection C, the Commissioner's argument about the third criteria – that plaintiff has a current history of at least one year's inability to function outside of a highly supportive living arrangement – is not persuasive. The Commissioner argues:

> [T]reatment records from Plaintiff's medical sources do not show that he required a highly supportive living arrangement. In fact, [Nurse Practitioner] Filippo assessed that plaintiff's mental impairment did not impact his ability to perform the activities of daily living. … Significantly, Plaintiff acknowledged that he had no difficulty independently performing his activities of daily living. And … [consultative psychologist] Dr. Gardner observed that plaintiff's mental status was generally unremarkable; he could perform simple, unskilled work; and, his psychiatric problems would not interfere with his daily functioning.

6.      This argument, however, is somewhat disingenuous, because the referenced evaluations occurred in the context of plaintiff living in a highly supportive living arrangement. Those arrangements presumably and hopefully maximized plaintiff's abilities. Thus, when the Commissioner asserts that plaintiff's "medical sources do not show that he required a highly supportive living arrangement," she leaves the question hanging – why was plaintiff living in a highly supportive living arrangement if he did not need it? And if he did need it, then doesn't his impairment satisfy the Listings?

7.      It seems to me that the Listings presume that if a social service agency has deemed plaintiff appropriate for highly supportive living arrangements, and plaintiff meets the other requirements of subsection A and the threshold test for subsection C, then that is sufficient to render him disabled. At the very least, it would require the ALJ to explain why the social

3

service agency was wrong. And opinions of nurses and consulting physicians are not very probative on that issue, because they do not discount for the possibility that plaintiff's highly supportive living arrangement may somewhat obscure his functional capacity, making it appear more enhanced than it would be absent these strong supports. For example, perhaps if plaintiff was forced to get his own apartment instead of having people looking in on him, he might well meet the decompensation requirements of the subsection or be too close to decompensating to be able to perform the activities of daily living that he does now (and upon which the ALJ heavily relied).

8. In the five-step sequential analysis, the Listing that constitutes step 3 is clearly to be used as a proxy for the more subjective weighing of competing medical opinions if, the Listing not having been met, the ALJ has to determine residual functional capacity between steps 3 and 4. What the ALJ did and the Commissioner seeks to continue, however, is the merging of step 3 with the analysis of residual functional capacity, the latter of which should not occur if plaintiff meetings the Listing requirements. This is improper because, as noted, we don't know what would happen if plaintiff did not have those supports.

9. In this case, one might argue over whether plaintiff's living arrangements are "highly supportive" or just "supportive," as the record is not expansive on the type of supportive arrangements he has. The use of "highly" in the Listings means that not just any supportive services will do. But we know that through a social service agency named Neighborhood Care Team[2], plaintiff has compelled roommates and a caseworker who checks in at the apartment, gives him reminders for cleaning and self-care, and makes sure there is food in the house. We

---

[2] NEIGHBORHOOD CARE TEAM, INC., https://neighborhoodcareteam.org/ (last visited Jan. 13, 2019).

also know that prior to this, he spent nine months in another assisted living facility run by another social service agency.

10. It is the responsibility of the ALJ, not this Court, to make the determination of why plaintiff does or does not meet the supportive living arrangement criteria in subsection C. I agree with plaintiff that the supportive housing arrangements that plaintiff has are enough to require, at least, a specific analysis of that issue. The ALJ's perfunctory reference to subsection C in the decision is insufficient for that purpose, and the case must therefore be remanded.

11. Separately, the ALJ failed to explain what weight she afforded the opinion of consultative psychologist Dr. Gardner – who found that plaintiff's impairment does not interfere with plaintiff's ability to function on a daily basis – even though she described this opinion at length and referred to it in multiple parts of her decision. As noted below, the ALJ did not give controlling weight to plaintiff's treating physicians. "[W]here an ALJ does not give controlling weight to the opinion of a treating physician, the ALJ must explain the weight that he gives to the medical evidence," including the opinions of a consultative psychologist. McFall v. Colvin, No. 15-cv-6176, 2016 WL 1657877, at *10 (W.D.N.Y. Apr. 27, 2016). This case should also be remanded for the ALJ to explain what weight she gave to Dr. Gardner's opinion.

12. Although the case will be remanded on these two grounds, the Court will consider plaintiff's other points of error to reduce the likelihood of future review proceedings.

13. One of these is that the ALJ failed to address whether other mental impairments identified by some of the physicians in the record besides bi-polar disorder were "severe," to wit, major depressive disorder, panic disorder, and anxiety disorder. Plaintiff cites a non-precedential Second Circuit decision holding that it is reversible error for the ALJ to fail to separately consider major depression and bipolar disorder, at least where the physicians in the record

viewed them as separate diagnoses. See Burgin v. Astrue, 348 F. App'x 646 (2d Cir. 2009). The rationale of Burgin was that because impairments must be considered in combination, 20 C.F.R. § 404.1523, impairments must be addressed when assessing residual functional capacity even if one or more of those impairments is not severe. Plaintiff has cited another non-precedential case holding that remand was required because, *inter alia*, the ALJ only considered diagnoses of anxiety and depression but not two other physicians' diagnoses of "affective disorder." See Lucas v. Barnhart, 160 F. App'x 69 (2d Cir. 2005). Lucas was based on the ALJ's failure to develop the record as to the separate diagnoses.

14. The Commissioner has not addressed these cases but they are materially distinguishable. Unlike in Burgin, plaintiff here can hardly argue that the ALJ failed to address his symptoms of depression, panic and anxiety in determining plaintiff's RFC between steps 3 and 4 of the sequential analysis. The decision shows that the ALJ was well aware of the symptoms. Rather, plaintiff's argument is that the ALJ should have discussed whether those diagnoses gave rise to a "severe" impairment, which was not the issue in Burgin. Although plaintiff, trying to bootstrap himself into Burgin, urges in one sentence that the ALJ failed to consider the combination of impairments, it is plain that the ALJ did consider them in combination – she just did not find any severe except bipolar disorder.

15. It may be that the ALJ found the most obvious severe disorder to be bipolar, perhaps because it is often more severe than a depressive, panic, or anxiety disorder, the symptoms of which can certainly be present in bipolar disorder. Of course, it is true that these disorders are not at all equivalent, and have different, if overlapping, symptomology.[3] But the

---

[3] See generally *Bipolar Disorder or Depression?*, WEBMD, https://www.webmd.com/bipolar-disorder/bipolar-vs-depression#1 (last visited Jan. 13, 2019); *Bipolar Disorder*, at NATIONAL INSTITUTE OF MENTAL HEALTH,

ALJ's discussion of plaintiff's symptoms leaves me without doubt that even had she found that plaintiff had additional severe impairments of a depressive, panic and/or anxiety disorder, her assessment of plaintiff's RFC – which, in the end, is all that matters – would have been the same. The remand need not reconsider this issue.

16. Plaintiff's next point of error is that the ALJ cherry-picked the record, particularly, the extensive treatment notes that the record includes. This had the ripple effect, according to plaintiffs, of causing the ALJ to discount the opinions of plaintiff's treating physicians and nurse practitioner on the ground that those opinions were inconsistent with the treatment notes.

17. Plaintiff claims that the ALJ culled those references in the record that tend to show plaintiff is not disabled and ignored those references suggesting that he might be. The only example of this allegedly selective view of the ALJ that plaintiff offers is that the ALJ "selectively rel[ied] largely on isolated notes that [plaintiff] was playing sports and active or that [plaintiff] adequately socialized with friends and family." To challenge this finding, plaintiff argues that the record shows he "is not physically active and is obese;" that "he used to engage in sports activities;" and that "there is only one mention in hundreds of pages that he played catch with a roommate … or previously played baseball."

18. Even without regard to the substantial evidence standard, which leaves it to the ALJ to weigh and resolve conflicts in the evidence, I think it is plaintiff who is cherry-picking this record. For example, plaintiff was receiving counseling services from an organization known as Transitional Services for New York, Inc., a social service organization that develops

---

https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (last visited Jan. 13, 2019) (Bipolar II disorder is "defined by a pattern of depressive episodes … .").

adaptive plans for people with mental illness. On November 25, 2014, reasonably late in his insured period, his counselor at TSI entered a progress note commenting on whether plaintiff had met a previously agreed-upon "objective" of "engag[ing] in one activity in the community weekly. [Plaintiff] will report one coping skill learned that he has used to reduce his anxiety bi-weekly … ." The progress note recited the following:

> [Plaintiff] has obtained the above objective. [He] reported his engagement in an activity with friends weekly. He stated that he plays baseball every weekend with his friends. He reported that his involvement in playing this sport allows him the opportunity to socialize and in addition stay physically healthy. [Plaintiff] stated that he is also in the process of completing necessary requirements to begin volunteering at an animal shelter.

There are only three conclusions that can be drawn from this evidence: (1) it's the truth; (2) the counselor misunderstood plaintiff; or (3) plaintiff was dissembling to his counselor.

19. The ALJ could reasonably reject the second option because of the specificity of the progress note, and she could also reject the third since it is hard to see any reason why plaintiff would fabricate this information in speaking to his counselor. This is particularly true since this note, consistent with a number of other references in the record, also expressly mentions plaintiff's intent to devote his full attention to getting disability benefits, so that if plaintiff was inclined to shade his statements to his providers, his motivation would be to make himself appear more impaired, not less.

20. To show that the ALJ's acceptance of the first option was improper, plaintiff cites me to a couple of other pieces of evidence in the record. The first is the somewhat vague testimony that plaintiff gave the ALJ at his hearing on March 15, 2016 when the ALJ asked about this point at the hearing:

> Q: You talked to some of your mental health providers about wanting to join a gym or spending time on a baseball field to stay fit. Are you still doing those kind of things?
>
> A: No, just my – my condition has gotten worse [] I'm not able to do the things that I wanted to or that I used to be able to do.
>
> Q: And when would you say your condition got worse?
>
> A: I don't know.
>
> Q: Was it recently?
>
> A: No, it's been a long time, but I don't know the exact date.
>
> Q: Well, I'm not looking for an exact date, I'm looking for weeks, months, years.
>
> A: Years.

Plaintiff also cites to a "Function Report" that he completed on February 3, 2014, in which he stated that before his condition arose, he "was able to go out and participate in different activities like sports with confidence and feeling like I'm worth something. Now I am constantly sad and anxious and just going to the corner store is a struggle mentally."

21. It seems likely that plaintiff played less (or perhaps no) baseball between November and February (as did most people in the Northeast). But that is hardly "years" that he had been unable to participate, as he told the ALJ. We thus have an inconsistency between what plaintiff told his counselor and what plaintiff told the ALJ and the Social Security Administration.

22. The inconsistency seems important, not only because the ALJ was permitted to conclude that, in fact, plaintiff does socialize and engage in baseball, but because it casts some doubt on whether he has accurately reported his conditions to his mental health providers, whose diagnoses depend on the truthfulness of plaintiff's statements to them. It would be exorbitant to apply the principle of *falsus in uno, falsus in omnibus* to all of plaintiff's statements to the Social Security Administration and his physicians, and the ALJ did not do that, but the contradiction

9

between his testimony (and statements to the Administration) and his statements to his counselor allowed the ALJ to have some skepticism about the actual degree of his self-professed impairment.

23. One other point that plainly caused the ALJ to question the degree of plaintiff's impairment was his dedication to obtaining Social Security benefits. As the ALJ commented, "the treatment records [from TSI] indicate that []he is not motivated to seek work or pursue an education. Instead, he intends to rely on benefit payments to allow him to live independently." This observation, in my view, is an accurate reading of the record, as there are numerous indications of plaintiff's commitment to obtaining disability benefits.

24. However, the ALJ's observation somewhat begs the question of whether, as the ALJ implied, plaintiff is seeking benefits simply because receiving a monthly check is easier than working, or, in contrast, whether he is diligently seeking benefits because he cannot work. If this were *de novo* review, I might conclude the latter, especially since in November, 2014, his counselor at TSI expressly set forth a therapeutic objective of obtaining benefits: "Within the next six months, [plaintiff] will secure his SSI benefits. He will meet once monthly with service coordinator to discuss and problems he is experiencing obtaining his SSI." But this again seems to me part of the credibility evaluation relegated to the ALJ.

25. Plaintiff also claims that the ALJ's tracking of GAF scores is misplaced because "both the Commissioner and the mental health community disfavor" the use of GAF scores. But the ALJ explicitly acknowledged the limitations of GAF scores – which she described as "no[t] function-by-function assessments of the claimant's capacities" – and only gave them "at least some weight." The ALJ further noted that the GAF scores were consistent with the medical

evidence. Since the ALJ acknowledged the limitations of GAF scores and did not appear to rely heavily on the scores, her occasional reference to GAF scores is not a reason to remand.

26. Plaintiff also challenges the ALJ's diminution of his treating physician's opinions from two TSI psychiatrists, Dr. Stacy Yearwood and Dr. Zelmar Vukasin. Dr. Yearwood's opinion was set forth in a "to whom it might concern" letter dated May 13, 2014. It is actually one of four, similarly worded opinion letters issued by TSI health care personnel, two of the latter three having been signed by plaintiff's psychiatric nurse, Diane DeFilippo, and the last signed by Darshini Singh, identified as "Service Coordinator II." Dr. Yearwood's letter recited that plaintiff had Bipolar II Disorder and Anxiety Disorder NOS (not otherwise specified), and stated that

> Despite treatment, he continues to suffer from depression, paranoia and intermittent panic attacks which limit his ability to concentrate and function in any meaningful capacity.
> It is my clinical determination that [plaintiff's] symptoms preclude his ability to function in a work environment without risk of decompensation and hospitalization. At this time, financial support to maintain stability would be greatly beneficial to him.

27. Nurse DeFilippo's first letter, dated June 3, 2015, was virtually identical to Dr. Yearwood's letter. Her July 22, 2015 letter reflected that TSI had changed his diagnosis to Bipolar I Disorder with psychotic features. Also, as compared to Dr. Yearwood's letter, it changed "intermittent" to "frequent" panic attacks, and added that a social work environment would put plaintiff at risk for "severe anxiety" as well as decompensation and hospitalization. The letter from Darshini Singh, dated July 23, 2015, noted the change in diagnosis from Bipolar II to Bipolar I. Her letter, like the three others, included the reference to being unable to function in a work environment and the need for financial support, but dropped the reference to panic attacks.

11

28. Dr. Vukasin's opinion consisted of a marginally more detailed functionality checklist, in which he found plaintiff had "marked" deficiencies in all aspects of work-related social skills. He noted the diagnosis of Bipolar I with Psychosis. When the form asked for "the medical/clinical findings that support this assessment," he wrote "serious mental illness."

29. The ALJ essentially rejected all of these opinions from TSI personnel (i.e., gave them "little weight") but focused on those of the psychiatrists. She held that Dr. Yearwood's assessment

> is inconsistent with [the] treating record [citing exhibits]. These records establish that the claimant's level of functioning was relatively high, and much better than Dr. Yearwood's letter might indicate. In fact, these records reflect only a goal of getting claimant into an independent living situation. Further, the claimant is described in the records as having some self-reported psychiatric issues, but no consistent complaints. There are no significant observations or objective findings in these notes. Rather the claimant is consistently reported as doing well and feeling generally well.

The ALJ rejected Dr. Vukasin's opinion for the same reasons.

30. Having reviewed the TSI treatment notes, I think that the ALJ was entirely correct. Although plaintiff occasionally self-reported what he termed a "panic attack," there is nothing in the notes to indicate what he considers a panic attack or any specifics of any attack he allegedly had, so I do not know where Dr. Yearwood and Nurse DeFillipo got the notion that these panic attacks were either "frequent" or "intermittent". The closest thing in the notes to what might be termed an instance of decompensation is when plaintiff, in an effort to dispose of undescribed documents, burned them in a bathtub. Similarly, except in one instance, the TSI doctors marked plaintiff as negative for paranoia, although there was some mention in the treatment notes of ideas of reference.

31. In fact, I cannot find anything justifying a diagnosis of Bipolar II, let alone elevating that diagnosis to Bipolar I with psychosis. Although there is plenty of evidence of insecurity, anxiety, and depression, there does not seem to be anything approaching a manic episode except, perhaps, the bathtub incident. And as far as Dr. Vukasin's opinion, "serious mental illness" is not a medical or clinical finding to support the extreme diagnosis he offered of Bipolar I with psychosis.

32. As noted above, the ALJ strongly implied that plaintiff's motivation was to obtain disability benefits because that's easier than working. Also as noted above, I cannot fully accept that conclusion. But because each of the four "to whom it may concern" letters stressed how "financial support to maintain stability would be greatly beneficial," I do not think it is an unfair conclusion, when viewed against plaintiff's relatively benign and positive treatment notes, that his health providers were influenced in their diagnosis and opinions by their desire to help him get disability benefits.

33. Finally, plaintiff argues that the hypothetical posed to the vocational expert was improper because it was based on the ALJ's determination of plaintiff's residual functional capacity. This follows from plaintiff's other arguments that I have already rejected.

34. Plaintiff also claims that this hypothetical did not include interaction with supervisors, even though the ALJ's decision stated that the hypothetical included occasional interaction with supervisors. Plaintiff characterizes this discrepancy as a "glaring and unambiguous error," but I disagree. The hypothetical posed to the vocational expert included "occasional interaction with coworkers," which the ALJ could have reasonably interpreted to include interaction with supervisors.

35. Plaintiff's motion for judgment on the pleadings is granted and defendant's motion for judgment on the pleadings is denied. The case is remanded for sole purposes of the ALJ's re-evaluation of whether plaintiff meets the requirements of Listing 12.04 and 12.06, subsection (C) and for her to explain what weight she afforded Dr. Gardner's opinion.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
January 14, 2019